**PLANNED PARENTHOOD OF NORTHWEST INDIANA, INC. and Nurse Debra Pasternak, Defendants–Appellants,**

v.

**Anita VINES and Timothy Vines Plaintiffs–Appellees.**

**No. 37A03–8805–CV–143.**

Court of Appeals of Indiana, Third District.

Sept. 14, 1989.

Richard A. Hanning, Eichhorn, Eichhorn & Link, Hammond, for defendants-appellants.

William J. Cunningham, Hilbrich, Cunningham & Schwerd, Highland, for plaintiffs-appellees.

GARRARD, Presiding Judge.

Planned Parenthood of Northwest Indiana, Inc. and Nurse Debra Pasternak (collectively "Planned Parenthood") appeal a jury verdict in favor of Anita and Timothy Vines. A jury in the Jasper Circuit Court awarded Mrs. Vines $50,000 on her claim of negligence in the insertion of an intrauterine device (IUD) and awarded Mr. Vines $10,000 for lost consortium.

## FACTS

Anita had a history of unusual menstrual activity and in fact had experienced what seemed to her to have been several menses during her first pregnancy.[1] After the birth of that child, her menstrual cycle was particularly irregular and several months were "skipped." At the time in question Anita and Timothy were enduring some measure of marital difficulty and she did not then desire to have any more children. After exhausting her supply of oral contraceptives, Anita visited Planned Parenthood on August 22, 1984. She had recorded her last menses on August 8.

While at the clinic on that initial visit, the need for Anita to switch from birth control pills to other methods was discussed. After information gathering, consultation and a physical examination, Nurse Pasternak told Anita to return during her next menses at which time the IUD could be inserted. Anita declined Pasternak's offer of condoms or spermicidal foam opting, instead, to abstain from sexual activity while awaiting the insertion of the IUD.

Anita did not menstruate during the month of September; however, with the onset of what appeared to be a typical menstrual flow on October 22, she made an appointment to return to Planned Parenthood for the IUD insertion on October 24. After a cursory examination, Nurse Pasternak placed the IUD in Anita's uterus. Anita was informed that following insertion of an IUD, vaginal bleeding continuing beyond the typical menstrual time period was not uncommon.

Anita experienced some vaginal bleeding over the course of the next two weeks. She alleges that she twice called the clinic only to be assured that this bleeding was not unusual. The bleeding worsened, Anita "passed a clot" and after fainting was taken to the Munster Community Hospital emergency room on November 10, 1984. Anita was diagnosed as having had an incomplete abortion. Her regular gynecologist, Dr. Walter P. Urbanski, attended to her while there in the hospital. He per-

---

1. Pregnancy and true menstrual activity are mu- tually exclusive events.

formed an emergency D & C and recovered the IUD with what was later identified as placental matter entangled therewith. Dr. Urbanski released Anita from the hospital three days later and thereafter released her to return to her waitressing duties one month later.

The Vines filed suit in the spring of 1985 against Planned Parenthood and Mary Doe, Nurse. Nurse Pasternak was subsequently identified and was formally named as a party defendant. The Vines' claim for relief as against Planned Parenthood proceeded presumably upon the theory of *respondeat superior*. The case went to trial on February 2, 1988 and resulted in a verdict in the Vines' favor. This appeal ensued.

Additional facts will be supplied where necessary.

## ISSUES

Planned Parenthood asserts that the trial court committed six [2] reversible errors, rephrased as follows:

1. Refusing to direct a verdict in the defendants' favor as to Timothy Vines' consortium claim on the grounds that the Vines were not consorting before or at the time of Anita's hospitalization;

2. Entering judgment on a jury verdict based upon the allegedly inherently improbable testimony of the plaintiff;

3. Entering judgment on the motion despite the plaintiffs' failure to establish the standard of care required of a nurse practitioner;

4. Allowing the plaintiffs' standard of care expert to respond to a hypothetical question based neither on facts in evidence nor reasonable inferences therefrom;

5. Omitting a tendered instruction regarding the possibility of a spontaneous miscarriage, modifying an instruction relating Nurse Pasternak's duty of care, and modifying the de-

fendants' instruction concerning a patient's obligation to provide accurate and complete information to, and follow instructions from, her health care provider; and

6. Failing, when confronted by a verdict awarding excessive damages, to enter final judgment on the evidence for the amount of the proper damages, grant a new trial or grant a new trial subject to remittitur as authorized in Indiana Rules of Procedure, Trial Rule 59(J)(5).

*Issue One*

 When Planned Parenthood asserts that consortium cannot possibly obtain when the couple is not consorting, it misapprehends the nature of that action. Consortium as a tort was originally based on a husband's claim for lost services, but, as the legal rights of women developed under the pressure of the Married Women's Act and the equal protection doctrine, the claim has come to focus on damages to "the marital relationship and the rights attendant upon it." Prosser and Keeton, *The Law of Torts* 932 (5th ed. 1984). That is, one is entitled to expect certain rights and benefits upon entry into the marriage relationship and the action is for the recovery "not only for services, society, and sexual relations lost at the date of trial but [also] estimated future loss." 2 Harper, James, and Gray, *The Law of Torts* 551 (2nd ed. 1986). These rights or expectations attach at marriage and are extinguished only upon death or divorce. Therefore, the fact that a married couple was temporarily separated, goes to the issue of damages but not to a spouse's standing to maintain the action. Prosser and Keeton, *The Law of Torts* 918, n. 28 (5th ed. 1984).

 It is not our role to question the jury's damage calculation beyond a survey of the evidence and inferences therefrom which support such award. *Hanas v. Rasmussen* (1985), Ind.App., 484 N.E.2d 63, 67, *rehearing denied.* Despite the fact that

---

**2.** A seventh issue offering an alternative ground to sustain the verdict is raised in the Vines' brief and countered in Planned Parenthood's Reply Brief. Because we affirm over the errors alleged by Planned Parenthood, we will not address that seventh issue.

the Vines had previously separated and that Timothy Vines provided no financial support to his wife and child during the separation, the jury found that Timothy Vines suffered a loss of consortium in the amount of $10,000. To affirm that determination we can point to the fact that the Vines were together when Anita fainted and had to be rushed to the hospital and that they reconciled their differences following Anita's release from the hospital. Furthermore, there was testimony regarding consortium both in the form of services and society lost for some period of time following Anita's hospital stay. Lastly, we simply note that Anita was pregnant and there has been no suggestion whatsoever that her husband was not the father. Therefore, we will not reverse this damage award.

*Issue Two*

■ Planned Parenthood's second argument is that Anita Vines' testimony is simply unworthy of belief. At the outset we note that "[t]he jury, as the trier of fact, must weigh the evidence, draw any reasonable inferences, resolve conflicts in the evidence, determine the credibility of witnesses and decide in whose favor the evidence preponderates." *Ferdinand Furniture Co., Inc. v. Anderson* (1980), Ind.App., 399 N.E.2d 799, 805. Consequently, our standard of review allows us to overturn a jury's verdict only if there is no evidence on the elements of the plaintiff's claim which will support the verdict. *Farm Bureau Ins. Co. v. Crabtree* (1984), Ind.App., 467 N.E.2d 1220, 1225, *rehearing denied, transfer denied.* On such challenges to the sufficiency of the evidence we view the record in a light most favorable to the verdict, do not reweigh evidence, and will not rejudge the credibility of witnesses.

Planned Parenthood has phrased this aspect of its appeal as one involving the "inherent improbability" of the witness' testimony. This is, of course, a covert attack on Anita Vines' credibility. The cases that Planned Parenthood cite only appear contrary to our rule regarding our unwillingness to reweigh evidence and rejudge credibility. Upon closer examination, we

find them distinguishable. In *Penn v. State* (1957), 237 Ind. 374, 146 N.E.2d 240, our supreme court overturned a non-jury conviction for statutory rape where the prosecutrix's uncorroborated testimony that she, the defendant, and the defendant's wife spent several nights in the same bed was found to be so lacking credibility that a reasonable man could not say that the defendant's guilt had been proven beyond a reasonable doubt. In *Gaddis v. State* (1969), 253 Ind. 73, 251 N.E.2d 658, over two dissents that urged compliance with the rule that evidence is not to be reweighed on appeal, the supreme court reversed a robbery conviction where the victim, the prosecution's sole identification witness, was coerced by threat of imprisonment into identifying the defendant as the perpetrator. The complete lack of circumstantial evidence to support guilt coupled with the compulsion and coercion upon the complaining witness should have injected doubt in any reasonable man's analysis of guilt and, thus, the conviction was reversed. *Id.* These two criminal cases reflect factual circumstances where the only evidence of guilt was so lacking in probative value (fitness to persuade) that the court determined it was inadequate to surmount the burden of proof beyond a reasonable doubt.

Surely it is within an appellate court's province to engage in such analysis, but the scope of that inquiry must be limited by deference to the constitutional role of the factfinder. The *Penn* decision succinctly draws this distinction:

> If different persons might reasonably arrive at different conclusions from that reached by the trial jury, the verdict will not be set aside.... On the other hand if no reasonable man could find the evidence [sufficient] ... a verdict will not be sustained.

*Penn v. State, supra,* 237 Ind. at 380, 146 N.E.2d at 242. We might have found this plaintiff's testimony lacking in certain respects, but reasonable persons, especially jurors present during the entire trial, could have concluded otherwise.

The other two cases cited us in support of Planned Parenthood's "inherently improbable" line of argument are civil decisions of this court, neither of which imposes upon us an obligation to abandon our above-stated standard of review. *Connor v. Jones* (1945), 115 Ind.App. 660, 59 N.E.2d 577 is an *in banc* opinion where the court did conclude, as Planned Parenthood urges, that "the testimony of a witness which is opposed to the laws of nature, or which is clearly in conflict with principles established by the laws of science, is of no probative value." 59 N.E.2d at 581. However, that court added the following qualification in the next sentence: "where a court cannot say as a matter of law that the testimony of a witness is contrary to scientific principles, the law of nature or physical facts, *the question of whether such testimony does so conflict is one of fact for the jury." Id.* (emphasis added). *See also B. G. Hoadley Quarries, Inc. v. Eads* (1959), 129 Ind.App. 670, 160 N.E.2d 202. Planned Parenthood has not favored us with a discussion of how this rule applies to the case before us or what laws of nature have been contravened in the plaintiffs' case.

Finally, Planned Parenthood directs us to our 1970 opinion in *Beaman v. Hedrick* (1970), 146 Ind.App. 404, 255 N.E.2d 828, for the undisputed proposition that verdicts and judgments must be sustained, within the required standard of proof, with evidence of sufficient credibility and probative value. The *Beaman* decision was an appeal of a paternity finding wherein we reversed due to biological impossibility; a near full term child born only 202 days after the alleged sexual activity could not possibly be the defendant's child. Argument based on that opinion is unpersuasive since biological impossibility is not a question in this appeal. If Planned Parenthood is suggesting implicitly that Anita's testimony as to the possible dates of conception or as to the nature of her vaginal discharge on the date of insertion is contrary to the laws of science or is biologically impossible, its argument has not been sufficiently explicit to prove persuasive.

Turning to the testimony in the present case, there are certainly discrepancies[3] between Mrs. Vines' testimony at trial, her deposition and the exhibits introduced into evidence. Unless those discrepancies are so pronounced and irreconcilable, however, as to persuade us that the jury behaved irrationally, we will not second guess the jury's verdict.

One of the discrepancies Planned Parenthood focuses upon concerns the events occurring on the date of the IUD's insertion. The central fact upon which the plaintiffs predicate liability, Planned Parenthood proposes, was Anita Vines' having missed a period for at least 75 days before the date that the IUD was inserted. The difficulty with this basis for liability, it is suggested, is that on the date of insertion Nurse Pasternak asked Anita Vines whether she had had "abnormal menses" and Anita replied "no." However, on the initial visit, as the defendants' own records indicate, Anita described her irregular menstrual activity and was instructed to return during her next menses. Anita did return during what she believed to be her next menses. However, that date was approximately seventy-five days past her last menses and at least sixty-one days after her initial visit to Planned Parenthood. It is not for us to query how the jury interpreted the conflict between Anita's "no" to the question of abnormal menses yet was at the clinic per Nurse Pasternak's instructions to return during her next menses. Perhaps the jury concluded that a missed period was not an "abnormal menses."[4] Resolving that conflict was a jury function purely and simply.

---

3. Extensive discussion of conflicting testimony regarding telephone calls allegedly placed to Planned Parenthood in the two weeks between insertion and Anita's hospitalization goes directly to the witness' credibility but does not bear upon the essential elements of Anita's claims. That resolution was for the jury and we need not recount the details here.

4. The defendant's expert, Dr. Clarence Boone testified as follows: "When we speak of regular [menstrual] cycles, it has been stated many times that the most regular thing about a woman's cycle is [the] irregularity of it." (R. 854, 895.)

Likewise, we will not invade the province of the jury to weigh the remaining superficial conflicts in the testimonies. The evidence was sufficient.

*Issue Three*

■ Planned Parenthood next contends that the plaintiffs failed to establish the appropriate standard of care applicable to nurse practitioner Debra Pasternak. Nurse practitioners have been defined by the legislature as follows:

Nurse Practitioner means a registered nurse qualified to practice in nursing in a specialty role based on additional knowledge and skill gained by the registered nurse through formal organized program of study and clinical experience or equivalent as determined by the board, which does not limit but extends or expands the function of the nurse in the area of primary health care, which may be initiated by the provider in settings which shall include but not be limited to hospital outpatient clinics and health maintenance organizations.

IC 25–23–1–1(b). The State Board of Nursing has yet to establish separate rules and regulations for nurse practitioners despite its authority to do so. *See* IC 25–23–1–7.1. Nonetheless, by the terms of the statute, a nurse practitioner is a specialist and as such must be held to the standard of care appropriate to persons of such superior knowledge and skill.

■ In the context of medical negligence, a plaintiff must establish by a preponderance of the evidence (1) the standard of care owed the patient, (2) a breach of that standard, and (3) that the plaintiff suffered a compensable injury proximately caused by the defendant's breach of the standard. *Cf. Vlach v. Goode* (1987), Ind. App., 515 N.E.2d 569, 572 *rehearing denied.* A nurse, even one working under standing orders or a protocol established by a physician, "must meet the standard of care to which nurses practicing that profession in the community are held." *Cooper v. National Motor Bearing Co.* (1955), 136 Cal.App.2d 229, 288 P.2d 581, 587. *See also Whitney v. Day* (1980), 100 Mich.App. 707, 300 N.W.2d 380. The standard of care

and breach thereof must be established by expert testimony. *Long v. Johnson* (1978), 177 Ind.App. 663, 381 N.E.2d 93.

On the other hand, as the court recognized in *Wilson v. Sligar* (1987), Ind.App., 516 N.E.2d 1099, 1102, *rehearing denied,* the standard is satisfied where the testimony discloses concerning a particular procedure certain minimum standards of care that are uniform throughout the country for the particular practice.

■ Examination of Planned Parenthood's allegations concerning Vines' failure to establish the appropriate standard of care reveals that they are based upon semantics rather than substance. Dr. Gloria Smokvina, Dean of the School of Nursing at the Purdue University–Calumet Campus, testified she was familiar with the standard of care for nurses and nurse practitioners and that concerning the insertion of IUD's it was the same standard as that applicable to physicians (R. 674,675) Dr. Urbanski also testified that concerning the standard of care appropriate to the insertion of an IUD, the same minimum standard of care would apply to anybody. (R. 633) We find this evidence sufficient to ground Dr. Urbanski's subsequent testimony setting forth the applicable standard of care for Nurse Pasternak's insertion of an IUD in Mrs. Vines. *Wilson, supra.*

*Issue Four*

During the examination of Dr. Urbanski, he was asked if he were presented with a patient who had not had a menstrual cycle for 75 days, whether she would be a candidate for insertion of an IUD. He responded "After a proper workup" and then explained that to mean a physical examination and a pregnancy test that would be negative, or if there was still any confusion, a pelvic ultrasonography. Planned Parenthood contends this was an improper hypothetical question because it assumed a fact not in evidence, to-wit: the absence of a menstrual cycle for 75 days. In support of this contention, it points to the testimony of Mrs. Vines that when she returned to Planned Parenthood on October 24, she believed a menstrual flow had begun on October 22. Again, we disagree with Planned Parenthood and are forced to conclude its

argument is essentially semantic. Both Mrs. Vines' testimony at trial and the medical record made at the time indicate that her last menses had occurred August 8, a period of 75 days before October 22 when she believed a new menses had commenced. Thus, while the question might have been more particularized or while counsel on cross examination might have inquired concerning the impact on the doctor's opinion of an apparent menses commencing two days prior to the patient's appearance but after a 75 day lapse, we cannot say it was error to permit the question and its answer. Nor can we say the opinion expressed was wholly without probative value.

*Issue Five*

Planned Parenthood next complains of the court's refusal to give its tendered instruction No. 4 and the court's modification of its instructions numbered 1 and 7.

Plaintiffs' tendered instruction No. 4 would have advised the jury that if a spontaneous abortion would have occurred regardless of the type or mode of treatment that was rendered, then they should find for the defendants because plaintiff was required to establish by a preponderance of the evidence that the negligent acts charged caused her injuries. We find no evidence in the record directly suggesting the probability that Mrs. Vines' abortion was spontaneous.

■ Before the refusal to give a tendered instruction will constitute reversible error, the court must determine that the instruction correctly states the law, that there is evidence in the record to support the giving of the instruction, and that the substance of the instruction is not covered by other instructions which the court in fact gave to the jury. *Picadilly, Inc. v. Colvin* (1988), Ind., 519 N.E.2d 1217, 1219.

Here, the substance of tendered instruction No. 4 was adequately covered by the court's final instructions numbered 4 and 7, which clearly admonished the jury that in order to recover the plaintiffs were required to establish that Mrs. Vines' injuries were proximately caused by one or more of the negligent acts of the defendants.

■ Planned Parenthood's tendered instruction No. 1 advised the jury of the duty of care owed by a health care provider who holds herself out as a specialist and who undertakes service in a special branch of a medical or other healing science. The court gave the instruction but deleted from it a conclusory sentence stating that Nurse Pasternak was therefore held to the standard of care of a family nurse practitioner practicing in Hammond, Indiana. In view of our previous discussion concerning the evidence in this case to the effect of a universal minimum standard of care required for this procedure, it was not error for the court to delete the sentence in question. Indeed, under the rule of *Wilson, supra,* the additional sentence was not a correct statement of the law.

■ Similarly, the court deleted from defendants' instruction No. 7, concerning the duty owed by the patient to a health care provider, a paragraph which would have advised the jury that if Anita Vines failed to exercise reasonable care in providing accurate and complete information or in following instructions given to her, then the jury should find against her. The deleted portion of the instruction was an incorrect statement of the law since it made no reference whatever to causation. The substance of the instruction was adequately covered by the final instructions given by the court concerning contributory negligence on the part of Mrs. Vines. We find no error in the instructions given by the court.

*Issue Six*

The final issue is, also, unavailing. Planned Parenthood challenges the amount of the jury's verdict and asks us to question the trial court's decision not to employ Trial Rule 59(J)(5) to reduce both of the Vines' verdicts. This motion asks the trial court to enter the realm of the fact finder as a thirteenth juror. *State v. Bircher* (1983), Ind.App., 446 N.E.2d 607, 611, *rehearing denied.* Even while acting as the thirteenth juror, "the trial court cannot properly vary an award and enter judgment for a different amount unless it finds, *as a matter of law,* the damages were excessive or inadequate." *Pickett v. Pickett* (1984), Ind.App., 470 N.E.2d 751, 755. (emphasis in original). Indeed, "[o]ur ina-

bility to actually look into the minds of jurors and determine how they computed an award is, to a large extent, the reason behind the rule that a verdict will be upheld if the award falls within the bounds of the evidence." *Symon v. Burger* (1988), Ind. App., 528 N.E.2d 850, 853.

We will not say that, *as a matter of law*, the verdict was excessive even though the respective verdicts were almost exactly tenfold the special damages demonstrated. Both Anita and Timothy Vines' claims were of a nature where such intangible damages as pain, suffering and lost consortium are difficult to translate into dollar values. We cannot see into the jurors' minds and we find no outward evidence of passion or prejudice sufficient to ignore either the jury's verdict or the trial court's determination not to employ Trial Rule 59(J)(5). No reversible error has been demonstrated in the award of damages.

The judgment of the trial court is affirmed.

RATLIFF, C.J., and HOFFMAN, J., concur.